1998-NMSC-005

954 P.2d 56

**DAIRYLAND INSURANCE COMPANY, Plaintiff–Counter–Defendant–Appellee,**

v.

**Ronald HERMAN, personal representative of the Estate of Glenna Susie Herman and as father, guardian and next friend of Andrew D. Herman, a minor child, Defendant–Counter–Claimant–Appellant,**

**and**

**Peter H. Johnstone, administrator of the Estate of Ivan S. Fragua, deceased, Defendant–Appellee.**

No. 23718.

Supreme Court of New Mexico.

Dec. 18, 1997.

Rehearing Denied Feb. 10, 1998.

Grisham & Lawless, P.A., Thomas L. Grisham, Albuquerque, for Appellant.

Foster, Johnson, Harris & McDonald, J. Douglas Foster, Albuquerque, for Appellee.

## OPINION

FRANCHINI, Chief Justice.

{1} This case comes to us from the United States Court of Appeals for the Tenth Circuit, in accordance with its rule providing "for certification by a federal court of questions arising under the laws of that state which may control the outcome of a [federal] case" (10th Cir. R. 27.1), and our own certification statute, NMSA 1978, § 34–2–8 (repealed 1997) (relating to questions certified to the New Mexico Supreme Court). The following question regarding New Mexico law was submitted for our determination:

Does an insurer satisfy its duty to treat its interests and the interests of its insured equally, as a matter of law, when it requires a release of all claims, including subrogation claims, against its insured as a condition precedent to a policy limits settlement when there is a substantial likelihood of recovery in excess of policy limits?

The answer to this question is "No."

## I. FACTS AND PROCEEDINGS

{2} On August 3, 1989, Ivan Fragua, debilitated by a blood alcohol level of .21 as he drove a car owned by his passenger, Paula Suazo, abruptly swerved into the opposite lane head-on into another car and killed himself, Suazo, and Susie Herman, the driver of the other car, and severely injured Susie Herman's nine-year-old son Andrew who suffered two broken legs and a concussion and was trapped in the car beside his dead mother for two hours, and who thereafter was hospitalized for thirty-three days while his father, Ronald Herman, contended with the injuries to his son and the death of his wife. Fragua was unquestionably at fault.

{3} Fragua, as a permissive driver of Suazo's vehicle, was insured by Dairyland Insurance Co., a Wisconsin corporation. The liability limits of the policy were $25,000 per person and $50,000 per occurrence. Fragua's estate was insolvent. There is no question that the Dairyland policy limits were inadequate to satisfy the claims of those harmed by Fragua's tortious conduct. Dairyland eventually settled with Suazo's estate for $16,667, one-third of the $50,000 policy limit.

{4} Andrew incurred $33,580.22 in medical expenses. These were paid by Health–Plus of New Mexico, Inc., his father's health insurer. Ronald Herman, shortly after Andrew's release from the hospital, notified Health–Plus that it would receive no reimbursement for its payment of Andrew's medical expenses from the proceeds of any settlement with the estate of Fragua. However, Herman's refusal to pay did not foreclose all the potential sources of reimbursement available to Health–Plus. Under the equitable remedy of subrogation, Health–Plus, having paid Andrew's medical expenses, did have the right to seek compensation for the medical payments directly from Fragua, the person who caused the harm in the first place.

{5} Herman, on behalf of himself, and as personal representative of his wife's estate, and as guardian of his son Andrew, sought compensation from Fragua's estate and from Dairyland as Fragua's insurer. Both Herman and Dairyland profess to have made the first overture to settle these claims and each blames the other for obstructing any settlement. Each party points to its own numerous offers to settle. The record is discrepant as to the exact sequence of events. It appears that both parties initially agreed that Herman would accept a settlement of $33,333.33. This amount was the remainder, after the Suazo settlement, of the total $50,000 policy limit.

{6} Dairyland, however, consistently demanded that Herman release all claims against Fragua as well as his agents, insurers, heirs, and assigns, including any liens, indemnity agreements, or subrogated interests. Dairyland wanted its payment to be considered full compensation for all claims Herman would or could have against Fragua. It attempted to require Herman to destroy Health–Plus's subrogation rights by releasing them. Health–Plus, thus prevented from collecting the medical costs from Fragua's estate, would have had recourse only in collecting from Herman.

{7} Herman, on the other hand, insisted that the settlement would resolve no other claims than those he brought on his own

behalf and as personal representative of Susie and Andrew. He expressly excluded from the settlement "any possible subrogation claims for any medicals paid by other persons" on his behalf. Letter from Thomas L. Grisham, Herman's attorney, to Roger A. Page, Dairyland's attorney (Oct. 27, 1989). Herman was concerned that the $33,333.33 Dairyland initially agreed to pay was virtually equal to the amount paid by Health–Plus for Andrew's medical bills. Should Health–Plus seek full reimbursement, Herman would end up with nothing. A settlement was never reached.

{8} Fragua's automobile accident predicated several lawsuits, two of which are relevant to this proceeding. During this litigation, Peter Johnstone was named the personal representative of Fragua's estate. In one of the relevant lawsuits, Herman, in his individual capacity, and as administrator of ·Susie's estate, and as guardian of Andrew, filed a claim in New Mexico district court against Fragua's estate. On December 4, 1991, Herman was awarded a judgment of $2,725,000 on Susie's estate's claims and $275,000 on Andrew's and Herman's claims, jointly. *See Herman v. Johnstone*, No. CV–90–01295, slip op., Conclusions of Law ¶¶ 5–7 (N.M.Dist.Ct. Dec. 4, 1991). Judgment was entered on January 21, 1992, and bears interest at an annual rate of fifteen percent. *See Herman v. Johnstone*, No. CV–90–01295, slip op. at 1 (N.M.Dist. Ct. Jan. 21, 1992). Following entry of judgment, Dairyland paid the remaining policy limits of $33,333.33 in exchange for partial satisfaction of the judgment.

{9} More than a year thereafter, the other lawsuit relevant to this case was initiated. On February 23, 1993, Dairyland sued Herman in federal district court, seeking a declaratory judgment that it was not responsible for the remaining judgment in excess of policy limits against Fragua's estate. During this trial, Johnstone assigned to Herman all of Fragua's first-party claims against Dairyland. In his answer, Herman filed a counterclaim, in which he asserted Fragua's first-party claim for bad-faith failure to settle, and demanded Dairyland pay the full judgment, including the amount in excess of its policy

limits. Dairyland in turn responded with its own counterclaim in which it alleged Herman acted in bad faith during the settlement negotiations. Each party moved for summary judgment on both the declaratory-judgment action and their respective bad-faith counterclaims.

{10} On July 1, 1993, the district court decided the declaratory-judgment action by denying Herman's and granting Dairyland's motion for summary judgment. The court also granted summary judgment in favor of Dairyland on Herman's bad-faith counterclaim. Thereafter, Dairyland moved to dismiss its own counterclaim against Herman. This dismissal was granted with prejudice on July 11, 1995.

{11} Herman appealed these decisions to the Tenth Circuit Court of Appeals. That court has certified to us the question, quoted above, regarding an insurer's duties to itself and its insured, when, knowing that a claimant is likely to recover in excess of policy limits, the insurer refuses to settle unless it obtains a release of all claims including subrogation claims. We conclude that, under · such circumstances, Dairyland has not, as a matter of New Mexico law, satisfied its duty to its insured. Therefore, we answer the question certified in the negative. However, we also explain why there are factual issues that preclude summary judgment for Dairyland.

## II. ARGUMENT

### A. Good Faith in Settlement Negotiations

{12} "It is well settled that, absent a statute to the contrary, 'insurance contracts are construed by the same principles which govern the interpretation of all contracts.'" *Rummel v. Lexington Ins. Co.*, 1997 NMSC 041, ¶ 18, 123 N.M. 752, 758, 945 P.2d 970, 976 (quoting 2 Lee R. Russ & Thomas F. Segalla, Couch on Insurance 3D § 21:1 (1996)). Thus, with insurance contracts, as with every contract, there is an implied covenant of good faith and fair dealing that the insurer will not injure its policyholder's right to receive the full benefits of the contract. *See Ambassador Ins. Co. v. St. Paul Fire &*

*Marine Ins. Co.*, 102 N.M. 28, 30, 690 P.2d 1022, 1024 (1984) ("New Mexico recognizes this duty of good faith between insurer and insured."); *Comunale v. Traders & Gen. Ins. Co.*, 50 Cal.2d 654, 328 P.2d 198, 200 (1958) (stating "[t]here is an implied covenant of good faith and fair dealing in every contract"). More specifically, this means that "an insurer cannot be partial to its own interests, but must give its interests and the interests of its insured equal consideration." *Lujan v. Gonzales*, 84 N.M. 229, 236, 501 P.2d 673, 680 (Ct.App.1972).

{13} Regarding a good-faith duty to settle, there is no presupposition that settlement is always the preferred means of protecting the policyholder's interests. However, good faith does impose upon the insurer the duty to settle whenever practicable. *See Ambassador Ins. Co.*, 102 N.M. at 30, 690 P.2d at 1024 ("It is the policy of this state to favor settlement whenever feasible.").

> It is common knowledge that a large percentage of the claims covered by insurance are settled without litigation and that this is one of the usual methods by which the insured receives protection. Under these circumstances the implied obligation of good faith and fair dealing requires the insurer to settle in an appropriate case although the express terms of the policy do not impose such a duty.

*Comunale*, 328 P.2d at 201 (citations omitted).

{14} The insurer's good-faith evaluation of the costs and benefits of settlement is generally accorded deference. *See Ambassador Ins. Co.*, 102 N.M. at 30, 690 P.2d at 1024. However, judicial deference lessens whenever there is a substantial likelihood of a recovery that exceeds policy limits. *See Kelly v. Farmers Ins. Exch.*, 194 Cal.App.3d 1, 239 Cal.Rptr. 259, 261 (1987) ("The implied covenant, which is part of every insurance contract, imposes a duty on the insurer to settle a claim against its insured within policy limits whenever there is a substantial likelihood of a recovery in excess of policy limits."). The prospect of liability in excess of the policy limits presents an inherent conflict of interest between the insurer and its insured. The insurer may be willing to risk litigation in the hopes of avoiding the payment of the maximum policy limits; on the other hand, the insured will wish to avoid litigation for fear of being forced to pay an excess judgment out-of-pocket. *See generally Merritt v. Reserve Ins. Co.*, 34 Cal.App.3d 858, 110 Cal.Rptr. 511, 517–20 (1973). Under such circumstances, the insurer should place itself in the shoes of the insured and "conduct itself as though it alone were liable for the entire amount of the judgment." *Johansen v. California State Auto. Ass'n Inter-Ins. Bureau*, 15 Cal.3d 9, 123 Cal.Rptr. 288, 292, 538 P.2d 744, 748 (1975). "When there is great risk of a recovery beyond the policy limits so that the most reasonable manner of disposing to the claim is a settlement which can be made within those limits, a consideration in good faith of the insured's interest requires the insurer to settle the claim." *Comunale*, 328 P.2d at 201. When a claimant makes a firm reasonable offer to settle an excess claim within policy limits, the implied covenant of good faith and fair dealing may require the insurer to settle. *See Lehto v. Allstate Ins. Co.*, 31 Cal.App.4th 60, 36 Cal. Rptr.2d 814, 817 (1994) (as modified Jan. 13, 1995).

{15} We conclude that when there is a substantial likelihood of recovery in excess of limits, an insurer's unwarranted refusal to settle is a breach of the implied covenant of good faith and fair dealing. *See Foundation Reserve Ins. Co. v. Kelly*, 388 F.2d 528, 531 (10th Cir.1968); *Comunale*, 328 P.2d at 200–01. This is because when damages are likely to exceed policy limits, the insurer risks exposing its insured to even greater liability by going to trial rather than settling. Should an insurer, in violation of its duty of good faith, refuse to accept a reasonable settlement offer within policy limits, it will be liable for the entire judgment against the insured, including the amount in excess of policy limits. *Kelly*, 239 Cal.Rptr. at 262. The courts of this state will not permit insurers to profit by their own wrongs. *See Comunale*, 328 P.2d at 202.

## B. Dairyland's Arguments

{16} Dairyland attempts to distinguish this case from these general principles by

implying that Herman's settlement offer was neither reasonable nor in good faith. Dairyland claims that it would have violated its duty to its insured had it accepted Herman's settlement without insisting upon a release of the Health–Plus subrogation claim. Dairyland makes this claim because it contends that such a settlement would have placed Fragua, its insured, in risk of paying that subrogation claim out-of-pocket.

{17} The California case, *Coe v. State Farm Mutual Automobile Insurance Co.*, 66 Cal.App.3d 981, 136 Cal.Rptr. 331 (1977), addressed an issue similar to the one presented in this case. Dairyland describes *Coe* as the leading case on this issue and argues that we should follow its reasoning. In *Coe*, Bonnie Jean Strandberg negligently caused an automobile accident in which Richard Coe suffered severe injuries. Strandberg held an automobile policy with State Farm which insured against liability up to $25,000. At the time of the accident, Coe was driving in the course and scope of his employment, and was covered by workers' compensation insurance which was carried by the California State Compensation Insurance Fund. *Id.*, 136 Cal. Rptr. at 332. The Fund informed State Farm that it intended to seek reimbursement of the money it had paid in compensation for Coe's injuries by asserting a lien against any recovery by Coe from State Farm. *Id.* at 333. This reimbursement to the Fund was required by statute under the California Labor Code. *See* Cal. Lab.Code § 3859 (West 1971) (as amended 1971) (right to reimbursement); Cal. Lab.Code § 3860 (West 1971) (as amended 1971) (same concept); Cal. Lab. Code § 3856(b) (West 1971) (right to a lien); *Coe*, 136 Cal.Rptr. at 333 n. 1. By law, when the Workers' Compensation Fund was implicated in a suit for damages, no settlement was possible without the Fund's consent. *Coe*, 136 Cal.Rptr. at 337.

{18} Coe offered to settle with State Farm for the full policy limit of $25,000. *Id.* at 333. State Farm refused the offer for several reasons including the fact that there was no mention of a consent and release by the Fund. *Id.* at 334. Coe died, and his wife brought a wrongful death action against Strandberg which resulted in a verdict for

$250,000. *Id.* Coe's wife then took an assignment of Strandberg's rights against State Farm for bad-faith refusal to settle. She brought the action for bad faith and won more than $300,000. *Id.*

{19} On appeal, the California Court of Appeals rejected the bad-faith argument. The court emphasized that the fact that no settlement could be valid without the consent of the Compensation Insurance Fund was "imposed by law." *Id.* at 337. Thus, the failure of Coe "to offer or guarantee the Fund's consent and release ... meant that [no one] made an offer whose acceptance by [State Farm] would have produced a valid settlement of the claims against Mrs. Strandberg." *Id.* Therefore, the court held that "[i]n the absence of reasonable provisions for the legal rights of the Fund, we conclude that State Farm cannot be held liable for bad-faith 'rejection of a reasonable settlement offer.'" *Id.*

{20} Additionally, the *Coe* court concluded that acceptance of the settlement offer would have been in-and-of-itself an act of bad faith:

> Absent the offered and guaranteed written consent of the State Compensation Insurance Fund in [Coe's "offer"], acceptance by appellant of the "offer" would have left Mrs. Strandberg exposed to a recoupment action by the Fund. As appellant points out, this is clear as a matter of law. It was also established as a fact by the evidence in this case.
>
> Accordingly, acceptance by appellant of the "offer," as made, would have amounted to an abdication of its responsibilities to its own insured. Specifically, it would have breached its "implied covenant of good faith and fair dealing" not to "injure" her rights under its policy, and its obligation "to consider the interests of the assured equally with its own." Bad-faith refusal to accept a settlement offer cannot occur where "acceptance" would itself be bad faith.

*Id.* (citations omitted).

{21} Dairyland suggests that the unresolved claim for the statutory right of reimbursement by the Fund in *Coe* is analogous to the unresolved claim for the equitable

right of subrogation by a private insurer in this case. In both circumstances, if the settlements were accepted, the insureds would be exposed to these unresolved claims. Dairyland argues that we should find, as did the *Coe* court, that the true act of bad faith lay in acceptance rather than rejection of the settlement offer.

{22} We disagree. The two cases are not analogous. *Coe* was determined by specific California statutes that absolutely mandated the joinder of the State Compensation Insurance Fund in all settlements between employer and employee. These statutes meant that the "offer" made by Coe to settle the case was not legally permissible. The case before us is not comparable. The New Mexico workers' compensation laws are not implicated, nor have we been alerted to any relevant law that requires the participation of a governmental entity in a personal-liability automobile-insurance settlement. Health–Plus had no statutory right to be included in a settlement between Herman and Dairyland. Similarly, Dairyland was not required by any New Mexico law to refuse all settlement offers that failed to release the subrogation interests of Health–Plus. In *Coe*, the refusal to accept a settlement offer that violated state law was not an act of bad faith. In this case, where no comparable law is implicated, there is evidence that could support a finding of bad faith in Dairyland's refusal to settle.

## C. Subrogation

{23} There is no question that Health–Plus had the right, under New Mexico law, to seek reimbursement of the money it paid for Andrew's medical expenses from Fragua, the person who caused Andrew's injuries.

Subrogation ... is an equitable remedy of civil law origin whereby through a supposed succession to the legal rights of another, a loss is put ultimately on that one who in equity and good conscience should pay it. It is a remedy for the benefit of one secondarily liable, who has paid the debt of another and to whom in equity and good conscience should be assigned the

rights and remedies of the original creditor.

*United States Fidelity & Guar. Co. v. Raton Natural Gas Co.*, 86 N.M. 160, 162, 521 P.2d 122, 124 (1974) (citations omitted) (quoting *Fidelity & Deposit Co. v. Atherton*, 47 N.M. 443, 448, 144 P.2d 157, 160 (1943)). Contrary to Dairyland's assertions, however, it is not true as a matter of New Mexico law that an insurer acts in good faith by requiring a release of *all* the injured party's claims as a condition to settlement. It is true that some jurisdictions appear to support insurers that demand the release of all such claims. *See, e.g. McNally v. Nationwide Ins. Co.*, 815 F.2d 254, 261 (3d Cir.1987) (as amended on rehearing in banc April 23, 1987) ("[A]n offer is impermissibly conditional only if it requires payment without providing in return a guarantee that payment will result in full settlement of the claim on which the payment is made."). However, we conclude that there are circumstances in which the interests of the insured may be better served by an agreement that does not seek the release of subrogated claims. A jury may determine that this case presents such circumstances.

{24} On the other hand, an inflexible insistence on a comprehensive settlement is not, in-and-of itself, an indication of bad faith on the part of the insurer. *See Lehto*, 36 Cal.Rptr.2d at 821 ("We know of no case permitting an insured, or his assignee or claimant, to sue for bad faith on the basis of the insurer's rejection of a settlement demand because it did not include a complete release of the insured."). In fact, in many circumstances, the demand for a release of subrogated rights may be indicative of good faith; "an insurer can breach its duty to its insureds by disbursing the policy proceeds to the insureds' claimant without first obtaining a release of the insureds." *Id.; Cook v. Trinity Universal*, 584 So.2d 813, 815 (Ala. 1991) ("[T]he party attempting to satisfy his obligation or debt is wise to demand that the creditor, as a condition of settlement, sign a release acknowledging extinguishment of the debt.").

## D. Herman's Arguments

25} Herman, on the other hand, insists that his refusal to release the subro-

gation rights of Health–Plus was reasonable and in good faith. He emphasizes that Dairyland's policy limit of $33,333.33 was virtually equal to the $33,580.22 that Health–Plus paid for Andrew's medical bills. Had Herman accepted a comprehensive settlement and released the subrogation rights of Health–Plus, he risked being compelled not only to pay to Health–Plus the entire amount of the Dairyland settlement, but to continue paying all the ongoing medical expenses for his son. As stated above, subrogation "is an equitable remedy." *United States Fidelity,* 86 N.M. at 162, 521 P.2d at 124. Under the settlement terms urged by Dairyland, Herman risked being placed in the inequitable position of paying for harm caused by Fragua that, under equitable principles, should be paid by Fragua's estate. A claimant may reasonably refuse to release subrogated claims during settlement negotiations, if such a release may cause the claimant to lose a substantial portion of his or her recovery. The reasonableness of such a demand may preclude, as a matter of law, extinguishing all liability to the insured. Thus, a claimant's reasonable expectation is one factor a jury should consider in determining whether an insurer acted in bad faith in rejecting a settlement offer.

26} Herman argues that, in addition to the possibility that his own interests would have been compromised by the subrogation release, Dairyland's refusal to settle was in violation of the interests of its insured. Herman emphasizes that Dairyland must have been aware, upon verifying the circumstances of the automobile accident, that its policy limits were grossly inadequate to compensate the victims. Fragua, its intoxicated insured, drove on the wrong side of the highway, killed himself and two others, and seriously injured a child. The insurer cannot be expected to predict the outcome of a trial, nor does the insurer act in bad faith when it honestly and reasonably concludes that the policy limits will be adequate to compensate any liability. *Farmers Ins. Exch. v. Schropp,* 222 Kan. 612, 567 P.2d 1359, 1366 (1977) (quoting *Bollinger v. Nuss,* 202 Kan. 326, 449 P.2d 502, 514 (1969)). However, in this case, Dairyland cannot plausibly claim, "based on its honest judgment and acting on adequate information after competent investigation of the claim," that it did not need to settle and instead would be better advised to proceed to trial. *See Ambassador Ins. Co.,* 102 N.M. at 32–33, 690 P.2d at 1026–27. Herman asserts that, because of this extreme disparity between liability and compensability, Dairyland had a duty to use the policy limits to extinguish as much of the liability as possible and that it acted in bad faith by refusing to do so. *Cf. Lujan,* 84 N.M. at 237, 501 P.2d at 681 (stating, under the evidence, good faith was a factual issue when the insured was liable for a death, and insurer knew possibility of excess judgment, and the insured requested the case be adjusted or settled).

{27} Herman contends that, once he indicated a willingness to settle within the policy limits, Dairyland was required to settle. *See Lehto,* 36 Cal.Rptr.2d at 817. Herman states that if Dairyland had placed itself in the shoes of Fragua, its insured, and conducted itself as if it alone were liable for the entire judgment, there would have been a settlement. *See Johansen,* 123 Cal.Rptr. 288, 538 P.2d at 748. He further asserts that if Dairyland's money were at stake, it would certainly have blotted out as much liability as possible by settling Herman's claims and by dealing with the comparatively small subrogation claims separately.

### E. Duty to Minimize the Insured's Liability

{28} The insurance company's duty to the insured is not an inflexible requirement that it utterly eliminate its insured's liability. There are probably many circumstances-and there is evidence that this case may present one such circumstance-in which extinguishing the insured's liability is a practical impossibility. We think a better rule is that the insurer has a good-faith duty to minimize, if not eliminate, its insured's liability. The duty to the insured does not mandate an all-or-nothing approach. Rather, what is required is a balancing of the interests of itself and its insured, the reasonableness of the claimant's demands, and the probable outcome of litigation as opposed to settlement.

{29} Herman argues that Dairyland actually maximized the risk to itself and its insured by refusing to settle when it knew that Herman reasonably resisted a settlement that potentially left him with nothing, and that the policy limits were inadequate to give him full recovery. Moreover, Dairyland knew that a jury was likely to award an amount far in excess of the policy limits.

> [When] the insurance proceeds are so slight compared with the totality of claims as to preclude any chance of comprehensive settlement, the insurer's insistence upon such a settlement profits the insured nothing. He would do better to have the leverage of his insurance money applied to at least some of the claims, to the end of reducing his ultimate judgment debt.

*Liberty Mut. Ins. Co. v. Davis*, 412 F.2d 475, 480–81 (5th Cir.1969). Dairyland might have better served its insured it if had settled all of Herman's claims and left the subrogation rights outstanding. The trial court may find that this case presents a circumstance in which the insurer showed mistaken judgement in appraising its own interest and also demonstrated a bad-faith disregard for the interests of its insured. *See Lujan*, 84 N.M. at 237, 501 P.2d at 681; *Comunale*, 328 P.2d at 201.

## III. CONCLUSION

{30} We conclude that Dairyland may not have, as a matter of New Mexico law, satisfied its duty to treat its interests and the interests of its insured equally when it required a release of all claims, including subrogation claims, against its insured as a condition precedent to a policy-limits settlement when there was a substantial likelihood of recovery in excess of policy limits. It is a question that must be answered by the specific facts of the case. It is possible to interpret the events in this case as Herman would, characterizing Dairyland's conduct as a complete disregard for the interests of its insured. *Cf. Lujan*, 84 N.M. at 237, 501 P.2d at 681 (stating the facts could support a trial court's finding of bad faith on the part of the insured). On the other hand, Dairyland's conduct may be interpreted as a good-faith effort to protect its insured. Since the parties urge conflicting interpretations of the facts, the question of whether Dairyland acted in bad faith should be resolved at trial. *See Kelly*, 239 Cal.Rptr. at 264 (summary judgment was improperly granted since triable issues of fact exist concerning whether the insurer acted in good faith).

{31} **IT IS SO ORDERED.**

BACA and MINZNER, JJ., concur.