**James Howard BLANTON, Plaintiff,**

v.

**WINSTON PRINTING COMPANY, Defendant.**

**No. 2:93CV00392.**

United States District Court,
M.D. North Carolina,
Greensboro Division.

March 22, 1994.

James Howard Blanton, pro se.

James M. Powell and Brian Marc Freedman, Haynsworth, Baldwin, Johnson, and Greaves, P.A., Greensboro, NC, for Winston Printing Co.

## MEMORANDUM OPINION AND ORDER

SHARP, United States Magistrate Judge.

This case is before the court on the following motions: (1) Defendant's motion for summary judgment; (2) Plaintiff's motion to compel discovery; (3) Plaintiff's motion to amend his summary judgment response to include an affidavit; (4) Defendant's motion to strike Plaintiff's summary judgment response; and (5) Defendant's motion for sanctions, on which the court earlier deferred ruling.

For reasons set forth below, Defendant's motion for summary judgment is granted. Because the information sought in Plaintiff's motion to compel does not bear on the reasons for the grant of summary judgment, the court need not reach that motion. Plaintiff's motion to include his affidavit is **GRANTED.** Defendant's motion to strike is **DENIED,** as is Defendant's motion for sanctions.

### BACKGROUND

Plaintiff filed this action on July 1, 1993, alleging that the Defendant discharged him in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* (1993 Supp.) ("ADA"). Blanton claims that his employment was terminated because of a knee injury that prevented him from working.

## FACTS

In June 1990, Plaintiff was hired by Winston Printing to be a multimedia sales representative. (Blanton Deposition [hereinafter "Dep."] 22.) His supervisor was Thomas B. Carey. (Dep. 24.)

On January 4, 1991, Blanton received a memorandum, addressed to all sales associates, instructing him to report to Carey whenever he would be out of the office due to illness or for personal reasons. (Dep. 29–30.)

Between January and April of 1991, Blanton suffered from various illnesses and personal problems that caused him to miss several days of work. (Dep. 36–37.)

On April 16, 1991, Blanton was advised in a written memorandum, followed by a personal meeting with Carey, that Carey did not believe Blanton to be adhering to the policy outlined in the January 4, 1991 memorandum. In the April 16 memorandum, Carey warned Blanton that when Blanton would be absent he would be required speak with Carey personally or leave a number where Blanton could be reached. (Dep. 31–34 and Exh. 2). That memorandum also noted that Carey believed he and Blanton had discussed the attendance policy "numerous times in the past few months." (Exh. 2.)

On August 15, 1991, Carey put Blanton on probation for 60 days "[d]ue to continued unapproved absences." (Dep. 40–41 & Exh. 3.) The probationary conditions were (1) that Blanton be in the company's offices during regular working hours unless making personal, approved, sales calls, and (2) that Blanton would not miss work without a doctor's excuse more than two times in the next 60 days. The letter warned that if condition (2) was not met, Blanton's employment would be terminated. (Exh. 3.) Blanton received the letter at a meeting with Carey which took place after Blanton was absent for several days due to recurring illness. (Dep. 40–42.)

On September 16, 1991, Blanton met with Carey and James Gordon to discuss Blanton's attendance. (Dep. 50.) Blanton had been absent each of the five days preceding that meeting, again due to illness. At the meeting, Blanton was asked to choose between various employment options, including resignation from Winston Printing. (Dep. 51.) Blanton chose to remain with the company, promising to improve his communication with Carey when Blanton would be out of the office. (Dep. 54–55 and Exh. 4).

Blanton was again absent October 14–18, 1991. (Dep. 66.) Later in October, at the suggestion of a superior, Blanton contacted a counselor retained by Winston Printing, as well as other counselling services in the Greensboro area, including the Greensboro Veteran's Center. (Dep. 66–68.) On November 1, 1991, Blanton was admitted to the Veteran's Administration hospital in Durham, North Carolina for the evaluation and treatment of post-traumatic stress disorder. (Dep. 68.) Blanton stayed in the hospital for approximately 11 or 12 days, during which time Winston Printing paid him disability income. (Dep. 68.)

In January 1992, Blanton missed nine days of work due to illness and the death of his daughter. (Dep. 69.) He missed one day in February due to illness. (Dep. 69.) In March, he was absent due to an intestinal virus. (Dep. 73.) In June, Blanton missed three additional days of work, although he worked from his home part of that time. (Dep. 74–75.) According to company records, Blanton missed 12 days of work between January 1, 1992 and June 8, 1992. (Exh. 5.) On June 8, 1992, Carey again met with Blanton to discuss Blanton's absences. Carey warned Blanton that beginning July 1, 1992, continued absences would not be tolerated and Blanton would be subject to dismissal. (Dep. 75–78 and Exh. 5.)

On July 7, 1992, Blanton contacted a supplier without permission from the appropriate supervisors at Winston Printing, in violation of company policy. (Dep. 83.)

The injury underlying this case occurred on July 4, 1992, when Blanton noticed that his knee was swelling without any apparent trauma to the knee. (Dep. 93.) That day, he was examined and treated by Dr. Guest, who did not diagnose the cause of the condition at that time. (Dep. 94.) He was told to stay off the knee, stay home from work, and return for treatment on July 7, 1992. (Dep.

95.) Blanton returned to the doctor on July 7, when he was told to return again on July 10 and to continue to stay off the knee. (Dep. 97.) Within approximately one week of treatment, Blanton could drive and walk satisfactorily. (Dep. 109.)

On July 10, 1992, Blanton, Chuck Whitman, James Gordon, and Tom Carey held a telephone conference during which Blanton was placed on an unpaid leave of absence due to excessive absences and unprofessional actions. (Dep. 102–05.) Blanton was told to return to work on August 10, 1992.

When Blanton returned to work August 10, the only difficulty presented by the knee condition was in negotiating stairs. (Dep. 110.) Because Winston Printing had an elevator, his work was not affected by the knee condition. (Dep. 110–11.)

On Sunday, September 13, 1992, Blanton's knee again began to swell. (Dep. 122.) Blanton missed work on September 14 and 15. (Dep. 122–29.) On September 15, Blanton was again treated by a doctor. (Dep. 129.) Blanton had called Carey on September 13, and had spoken with someone else at the office on September 14 and possibly September 15, but did not call the office at all on September 16, 17 or 18. (Dep. 122–34, 142.) Blanton asked the physician's assistant to call Carey on September 15. (Dep. 131.)

Beginning September 13, Blanton's knee remained swollen for approximately eight to ten days; by October 10, he was able to function relatively normally. (Dep. 146, 153.) The knee was eventually treated by an orthopedist on November 16, 1992, when a tear of the medial meniscus was diagnosed as the problem underlying both episodes of swelling. (Dep. 146 and Exh. 14.)

On September 29, Blanton sent Carey a mailgram advising Carey of the knee condition and that the treating physician would be forwarding to Carey copies of Blanton's medical records. (Dep. 148.) At some point in late September, someone employed by Blanton's dentist contacted Winston Printing and was told that Blanton was no longer employed there. The dental assistant informed Blanton of this fact in late September or early October. (Dep. 154.)

Blanton's next contact with Winston Printing occurred on November 5, 1992, when he called to discuss his termination. (Dep. 151.) Blanton had never received the company's letter of termination, dated September 18, 1992, which stated that Blanton was being fired due to his failure to contact the company on September 16, 17, and 18, 1992. (Exh. 9.)

On December 1, 1992, Blanton was released by his orthopedist to return to full employment. (Exh. 15.) He was unable to afford the recommended arthroscopic surgery to ameliorate the knee condition. He retains slight limitation of his knee function; he can not run well nor climb stairs easily. (Dep. 167.)

Blanton filed a charge with the Equal Employment Opportunity Commission, which found no violation of the ADA and issued a right to sue letter. (Exh. 16.)

### DISCUSSION

#### A. The ADA Claim

The Americans With Disabilities Act, 42 U.S.C. 12101 *et seq.* (1990) ("ADA"), is a remedial statute designed to ensure that employers will not deny qualified persons with disabilities employment opportunities on the basis of a real or perceived handicap. *Interpretive Guidance on Title I of the Americans With Disabilities Act*, 29 C.F.R. Pt. 1630, App. (1993). Section 12112(a) of the ADA sets out the "general rule" of the Act as follows:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). "Covered entity" includes all employers, and therefore prohibits Defendant Winston Printing from discriminating against otherwise qualified individuals with disabilities. 42 U.S.C. § 12111(2).

■ The threshold question in this case is whether Plaintiff can be considered a "qualified individual with a disability" within the

meaning of the ADA. Plaintiff's claim is bottomed on the fact that his employment was terminated during a period when his knee had been injured and prevented him from caring for himself, walking, and attending work. A central issue of the case, then, is whether Blanton's knee injury constitutes a "disability" under the ADA. Because the court concludes that it does not, Plaintiff's claim must fail.

The ADA defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). In turn, the Act defines "disability" as "(A) [a] physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).

To further clarify the physical conditions intended to be within the purview of the ADA, it is helpful to consult the Act's interpretive guidelines. They state that "temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities. Such impairments may include, but are not limited to, broken limbs, sprained joints, concussions, appendicitis, and influenza." 29 C.F.R. pt. 1630 App.

The interpretive guidelines also provide the following guidance:

Part 1630 notes several factors that should be considered in making the determination of whether an impairment is substantially limiting. These factors are (1) the nature and severity of the impairment, (2) the duration or expected duration of the impairment, and (3) the permanent or long term impact, or the expected permanent or long term impact of, or resulting from, the impairment.... Thus, for example, a broken leg that takes eight weeks to heal is an impairment of fairly brief duration. However, if the broken leg heals improperly, the "impact" of the impairment would be the resulting permanent limp.

29 C.F.R. pt. 1630 App.

Blanton's knee injury, as debilitating as it may have been at times, was of a relatively short duration. The knee injury prevented Plaintiff from working for a matter of days in July, September, and October 1992. Given this fact, the interpretive guidelines unquestionably preclude a finding of "disability" under the ADA, even assuming that "major life activities" were temporarily impaired when the knee was at its worst.

Further, the medical record shows in uncontradicted fashion that Blanton's post-injury physical condition is nearly as good as it was prior to the tear. As of the date of his deposition (October 7, 1993), Blanton's only remaining difficulties were running and ascending and descending stairs. The interpretive guidelines directly address this situation:

An individual is not substantially limited in a major life activity if the limitation ... does not amount to a significant restriction when compared with the abilities of the average person. For example, an individual who had once been able to walk at an extraordinary speed would not be substantially limited in the major life activity of walking if, as a result of a physical impairment, he or she were only able to walk at an average speed, or even at moderately below average speed.

29 C.F.R. pt. 1630 App. Plaintiff's inability to run briskly or climb stairs as easily as he could before the injury are not sufficient residual effects to constitute a "disability."

Surveying the cases decided under the Americans with Disabilities Act and the Rehabilitation Act of 1973 (Rehabilitation Act),[1] the same result is achieved. For example, in *Evans v. City of Dallas*, 861 F.2d 846 (5th Cir.1988), a former city employee sued the city, asserting various federal and state

---

**1.** The Rehabilitation Act prohibits discrimination on the basis of a "handicap," which was replaced by the term "disability" in the ADA. The definitions of the two terms are identical and the two statutes are interpreted identically on this topic. *Interpretive Guidance on Title I of the Americans with Disabilities Act,* 29 C.F.R. pt. 1630 App. (1993).

claims in connection with the termination of his employment. After the trial court granted summary judgment for the city, Evans appealed. One of Evans' arguments on appeal was that the district court erred in dismissing his claim brought under the Rehabilitation Act. *Id.* at 852–53. Evans argued that he had a viable claim under the Act because one of the alleged reasons for his discharge was excessive absenteeism resulting from a knee injury which required surgery. *Id.* at 852.

The Fifth Circuit concluded that Evans was not an "individual with a handicap" within the meaning of the Rehabilitation Act: "Although the injury may have limited plaintiff's life activities during his recuperation, Plaintiff does not allege that it continues to do so; nor does he contend that others regard him as having an impairment that continues to do so." *Id.* (quoting district court opinion). The court noted also that the definition of "handicap," which mirrors the definition of "disability" in the ADA, is written in the present tense, implying that diminished physical capacity or the perception thereof continues to exist. *Id.* The court agrees with this interpretation.

In another case factually similar to the instant litigation, a chronically absent employee brought a discrimination claim under the ADA on the basis of a temporary injury. In that case, the court also rejected the ADA claim:

> Under the theory proposed by plaintiff to define his condition as a "handicap," the Court would have to find all chronic illnesses, whether transitory or permanent, that prevent an employee from meeting a regular work schedule, as a handicap under the Act. This is clearly inconsistent with congressional intent under the Act.

*Santiago v. Temple Univ.,* 739 F.Supp. 974, 979 (E.D.Pa.1990), *aff'd,* 928 F.2d 396 (3d Cir.1991).

■ Thus, the plain wording of the statute, the interpretive guidelines, and prior court decisions all indicate that a temporary injury with minimal residual effects, such as Plaintiff's, cannot be the basis for a viable claim under the Americans with Disabilities Act. Because of this finding, the court does not address Defendant's argument that, as an employee incapable of conforming to the company attendance policy, Blanton was not "otherwise qualified" within the meaning of the ADA.

Accordingly, summary judgment will be granted for Defendant.

## B. The Remaining Pending Motions

### 1. Plaintiff's Motion to Compel Discovery

Because judgment will be entered for Defendant, and the information Plaintiff seeks in his motion to compel has no bearing on the determinative issue of the case, Plaintiff's motion is now moot, and accordingly the court will not rule on it.

### 2. Defendant's Motion for Sanctions

■ At an earlier stage in the case, Defendant requested that the court impose sanctions on Blanton for his failure to appear for his own scheduled deposition. The court reserved ruling on the matter, and at this time will deny the motion. Blanton is proceeding *pro se,* and after the time of his earlier appearance before this court seems to have cooperated fully in discovery. Therefore, the court will not impose sanctions on him and Defendant's motion is **DENIED.**

### 3. Plaintiff's Motion to Amend

Plaintiff's motion to amend is **GRANTED.**

### 4. Defendant's Motion to Strike

Because Defendant's motion for summary judgment will be granted notwithstanding the excessive length of Plaintiff's response to it, the court will **DENY** Defendant's motion to strike.

### CONCLUSION

**IT IS ORDERED** that Defendant's motion for summary judgment is **GRANTED.** A Judgment will be entered dismissing this action will be entered contemporaneously with this Memorandum Opinion and Order. Defendant's motion for sanctions is **DENIED.** Plaintiff's motion to compel discovery is dismissed as moot. Plaintiff's motion to amend

his summary judgment response is **GRANTED**. Defendant's motion to strike is **DENIED**.