2002-NMSC-004

41 P.3d 333

**Frank TRUJILLO and Lorraine Trujillo, Plaintiffs–Appellees and Cross–Appellants,**

**v.**

**NORTHERN RIO ARRIBA ELECTRIC COOPERATIVE, INC., Defendant–Appellant and Cross–Appellee.**

No. 26,542.

Supreme Court of New Mexico.

Dec. 6, 2001.

Rehearing Denied Feb. 21, 2002.

Herrera, Long and Pound, P.A., Judith C. Herrera, Mark E. Komer, Santa Fe, NM, for Appellant.

Linda G. Hemphill, Annie–Laurie Coogan, Santa Fe, NM, for Appellees.

*OPINION*

FRANCHINI, Justice.

{1} Northern Rio Arriba Electric Cooperative, Inc. (NORA) appeals from a jury verdict granting damages to Frank and Lorraine Trujillo. Frank Trujillo had pursued a discrimination claim against NORA under the New Mexico Human Rights Act, NMSA 1978, §§ 28–1–1 to –15 (1969, as amended through 1993, prior to 1995, 2000, & 2001 amendments), alleging that NORA discriminated against him because of a medical condition when they fired him. *See* NMSA 1978, § 28–1–7(A) (1987, prior to 1995 & 2001 amendments). Plaintiffs subsequently filed a complaint in the district court for a trial de novo under NMSA 1978, § 28–1–13(A) (1987), and alleged additional claims, including Mrs. Trujillo's claim for loss of consortium. After a five-day trial, the jury returned a verdict favorable to Mr. and Mrs. Trujillo on all claims, finding that the firing of Mr. Trujillo violated the Human Rights Act and public policy, breached an implied contract of employment, intentionally inflicted severe emotional distress on Mr. Trujillo, and caused a loss of consortium for his wife. The trial court subsequently awarded attorney's fees and costs to the Trujillo attorneys. NORA filed an appeal directly to this Court under Section 28–1–13(C) of the Human Rights Act, arguing that the trial court erred in submitting the Trujillos' claims to the jury. Plaintiffs filed a cross-appeal seeking an increase in the amount of attorney's fees and various costs. We reverse the judgment in favor of Plaintiffs, thereby rendering the cross-appeal moot.

## I. FACTUAL AND PROCEDURAL BACKGROUND

{2} NORA is a cooperative nonprofit corporation with approximately fifteen employees. In 1995, Mr. Trujillo was employed by NORA in the billing department as a computer operator and billing clerk and had been with the cooperative for thirteen years. In the fall of 1994, after the cooperative had been cautioned by the certified public accounting firm that performed its annual audit about various irregularities, NORA began an internal audit to identify where the record-keeping and collection problems were occurring. On February 8, 1995, the three employees in the billing department, including Mr. Trujillo, attended a seminar designed to address billing errors and revenue losses that had been identified by the audit. At the seminar, which was intended to last several days, the employees were asked to report any billing problems they might know about that had not yet been uncovered by the audit. The following morning, Mr. Trujillo felt fatigued and told his co-workers that he had been dizzy and disoriented while driving to work. He left work early and did not come in the following day, which was Friday, but rather went to see a doctor. The following Monday, when Mr. Trujillo told the general manager of the symptoms he was experiencing, NORA placed him on sick leave to recuperate.

{3} Relying on the symptoms Mr. Trujillo reported to her, the doctor's working hypothesis was that they might represent a "transient ischemic attack like syndrome." Concerned that the episode might be a precursor to a stroke,[1] she referred Mr. Trujillo to several specialists for diagnostic testing. Mr. Trujillo underwent a cerebrovascular evaluation on February 24, 1995, with "unremarkable" results. The results of a treadmill test and an EKG fell within normal limits. On March 3, 1995, he had both an EEG and MRI of the brain; those tests did not reveal any problems.

{4} Based on these test results, Mr. Trujillo was cleared by his doctor to return to work on a part-time basis on March 7, 1995. Upon receiving the work release, NORA's general manager tried to contact the doctor by telephone and also sent a letter by facsimile asking for more information about the part-time work restriction. He received no response from the doctor. When Mr. Trujillo returned to work on March 13, 1995, he had been on sick leave for approximately a month. Upon return, he met with the general manager to discuss further concerns about Mr. Trujillo's job performance and additional problems with his work that had been discovered during his absence. The additional problems included delays in billing and inaccurate records which had resulted in lost and delayed revenues of thousands of dollars. With regard to the work release, the general manager stated that he was hesitant about having Mr. Trujillo work part-time hours and that he wanted him working full time. Following their discussion, the general manager placed Mr. Trujillo on administrative leave with pay.

{5} The following week, NORA sent Mr. Trujillo a letter advising him that his employment with NORA would be terminated as of March 20, 1995. The letter also described NORA's loss of confidence in Mr. Trujillo based on the shortcomings in his job performance. Under NORA's appeal process, Mr. Trujillo requested the Board of Directors to reinstate him. After his appeal was denied, he filed a claim under the Human Rights Act and then pursued a trial in District Court from which this appeal ensues.

## II. DISCUSSION

{6} NORA argues on appeal that it was error for the trial court to have submitted to the jury the claims related to the Human Rights Act, discharge due to medical condition and failure to accommodate. NORA also contends that it was error to submit the additional claims of retaliatory discharge, breach of implied contract, intentional infliction of emotional distress, loss of consortium, and punitive damages. In the proceedings below, NORA had filed a motion for summary judgment and motions for directed verdict at the close of the Trujillos' case and before submission to the jury in which they argued that the evidence presented was legally insufficient to sustain the Trujillo's claims. Over NORA's objection, the trial court instructed the jury on all claims.

{7} We treat NORA's argument as challenging the sufficiency of the evidence upon which the jury based its verdict. *See Gonzales v. N.M. Dep't of Health*, 2000–NMSC–029, ¶ 18, 129 N.M. 586, 11 P.3d 550. If the verdict below is supported by substantial evidence, which we have defined as "such relevant evidence that a reasonable mind would find adequate to support a conclusion," we will affirm the result. *See Landavazo v. Sanchez*, 111 N.M. 137, 138, 802 P.2d 1283, 1284 (1990). In assessing whether the evidence is sufficient as a matter of law to justify the jury's verdict, we review all evidence in the light most favorable to the verdict and resolve all conflicts in the light most favorable to the prevailing party. *Smith v. FDC Corp.*, 109 N.M. 514, 519, 787 P.2d 433, 438 (1990).

### A. Claims under the Human Rights Act.

{8} Mr. Trujillo claimed that NORA discriminated against him in violation of the

---

1. "A transient ischemic attack (TIA) always has a sudden onset and is an acute neurologic deficit usually reaching its maximum intensity in a few minutes and disappearing completely within 24 hours. By definition, a TIA cannot last longer than a 24–hour interval. Recognition is crucial since the transient ischemic attack may serve as a warning that a stroke is imminent." 3B *Attorneys' Textbook of Medicine* 89A.40, at 24 (Roscoe N. Gray et al. eds., 3d ed.1996).

Human Rights Act when it fired him because of a medical condition. Under the Human Rights Act, an employer is prohibited from discharging "any person otherwise qualified because of ... medical condition." Section 28–1–7(A). In interpreting our state Human Rights Act, we have previously indicated that it is appropriate to rely upon federal adjudication for guidance in analyzing a claim under the Act, with the following reservation:

> Our reliance on the methodology developed in the federal courts, however, should not be interpreted as an indication that we have adopted federal law as our own. Our analysis of this claim is based on New Mexico statute and our interpretation of our legislature's intent, and, by this opinion, we are not binding New Mexico law to interpretations made by the federal courts of the federal statute.

*Smith*, 109 N.M. at 517, 787 P.2d at 436; *see Kitchell v. Pub. Serv. Co.*, 1998–NMSC–051, ¶¶ 5–8, 126 N.M. 525, 972 P.2d 344 (relying on federal authority to aid in the interpretation of the phrase "otherwise qualified" in relation to a claim of discrimination based on medical condition). For this claim, the closest federal counterpart would be the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213 (1994) (ADA), a federal statute prohibiting discrimination against persons with a disability. The Tenth Circuit has stated that in order to maintain a disability discrimination claim under the ADA, a plaintiff must demonstrate "(1) that he [or she] is a disabled person within the meaning of the ADA; (2) that he [or she] is qualified ...; and (3) that the employer terminated him [or her] because of the disability." *White v. York Int'l Corp.*, 45 F.3d 357, 360–61 (10th Cir.1995). *See generally* 42 U.S.C. § 12112(a). Although the New Mexico statute uses the terms "medical condition" or "handicap" rather than the ADA term "disability," we believe in the context of this case that the terms can be viewed as interchangeable.

### 1. Medical Condition.

{9} NORA argues that Mr. Trujillo did not present sufficient evidence of a medical condition to support a claim under the terms of the Human Rights Act. The applicable regulations of the New Mexico Human Rights Division define a medical condition as "any medical condition as defined by an appropriate medical authority through documentation, or by direct witness of a clearly visible disablement." Rules & Regulations, N.M. Dep't of Labor, Human Rights Division, I(A)(26) (Nov. 11, 1988) (superceded 1998).

{10} NORA's objections to the jury verdict are twofold. First, they argue that the symptoms reported by Mr. Trujillo in February and March were insufficient to establish that he had a medical condition. Second, they contend that the medical evidence presented by the psychiatrist and neurologist was improperly admitted at trial because it was not relevant to the time period in question. We agree with both.

■ {11} At trial Mr. Trujillo testified about feeling ill on the morning after the billing department seminar on February 9 and described feeling exhausted, dizzy, and disoriented as well as experiencing some numbness in his arm. His original doctor did not testify, but her treatment notes were admitted into evidence over objection as unauthenticated. We agree with NORA that the medical records should not have been admitted. *See* Rule 11–803(F) NMRA 2001 (providing an exception to the hearsay rule for documents prepared and kept in the course of regularly conducted business activity "as shown by the testimony of the custodian or other qualified witness"). Additional medical evidence was presented through the psychiatrist who first saw Mr. Trujillo in October 1995 and who also relied upon the medical records of the doctor who had treated him. The psychiatrist testified that because the earlier diagnostic tests had ruled out a physical cause for Mr. Trujillo's problems, she concluded that Mr. Trujillo must have had a psychiatric illness. Although she considered Mr. Trujillo medically healthy when she saw him in October, he was depressed about losing his job, and she thus recommended an antidepressant and medication for anxiety. Based on what Mr. Trujillo had reported to her, she concluded Mr. Trujillo's illness on February 9 might have been an acute anxiety attack. The remaining medical evidence was introduced through the deposition of the neurologist who had per-

formed the EEG and MRI on Mr. Trujillo. His medical conclusions were also based on the medical records of the psychiatrist who had testified and a neuropsychologist who examined Mr. Trujillo in May 1995.

■ {12} Our review leads us to conclude that, even when viewing the evidence in a light most favorable to upholding the verdict, Mr. Trujillo failed to present sufficient evidence to show that he suffered from a medical condition at the time NORA discharged him. Although he testified to the symptoms he experienced during February and March, the nature of his condition was never identified or diagnosed at the time. Further Mr. Trujillo's problems existed for a short period; by March 13 he had been cleared to return to work by his doctor. In a letter dated March 31, 1995, this doctor stated that although her initial diagnosis of his illness was a transient ischemic attack-like syndrome, the diagnostic testing revealed that Mr. Trujillo had not suffered a stroke and was, in fact, at low risk of stroke. She also stated that he was "very capable of returning to full-time employment." Mr. Trujillo did not claim at trial to have suffered a relapse of these symptoms. Being ill is not synonymous with having a medical condition. We do not believe that the Legislature intended that the phrase "medical condition" in Section 28–1–7(A) include temporary illnesses with minimal residual effects. We hold that a jury could not have properly determined that Mr. Trujillo suffered from a medical condition under the Human Rights Act at the time he was fired by NORA and therefore the question of a violation of the Human Rights Act should not have been submitted to the jury.

{13} Consistent with our interpretation of Section 28–1–7(A), several courts have held that a temporary injury with minimal residual effects cannot be the basis for a sustainable claim under the ADA. *See, e.g., Hilburn v. Murata Elecs. North Am. Inc.*, 181 F.3d 1220, 1229 (11th Cir.1999) (holding that a thirty-eight day absence from work after a heart attack did not support claim that plaintiff was substantially limited in ability to work); *Sanders v. Arneson Prods., Inc.*, 91 F.3d 1351, 1354 (9th Cir.1996) (holding that temporary psychological impairment with no

residual effects was not of sufficient duration to be a disability under the ADA); *Rakestraw v. Carpenter Co.*, 898 F.Supp. 386, 390 (N.D.Miss.1995) (determining that a back injury of limited duration which was later remedied was not sufficient to constitute a disability); *Blanton v. Winston Printing Co.*, 868 F.Supp. 804, 807–08 (M.D.N.C.1994) (holding that a temporary knee injury with minimal residual effects cannot provide a basis for an ADA claim).

■ {14} We also determine that it was error for the trial court to have admitted the psychiatrist's testimony regarding Mr. Trujillo's medical status at the time of treatment as opposed to the time of the adverse employment claim. The fact that Mr. Trujillo was eventually diagnosed as depressed in September 1995 is irrelevant to this case. The employment action affecting Mr. Trujillo occurred in March 1995, and we evaluate his medical claim based on how the alleged condition manifested itself at that time. *See Cameron v. Navistar Int'l Transp. Corp.*, 39 F.Supp.2d 1040, 1046 (N.D.Ill.1998) (concluding that medical records that pertain to plaintiff's condition after the employment decision did "not shed light on [plaintiff's] condition at the relevant time"); *cf. Browning v. Liberty Mut. Ins. Co.*, 178 F.3d 1043, 1047 (8th Cir.1999) (stating that the determination of whether employee is a "qualified individual" under the ADA must be based on his or her capabilities "as of the time of the employment decision"). The psychiatrist did properly testify regarding her opinion of Mr. Trujillo's symptoms on February 9; this testimony was relevant to the issue of whether Mr. Trujillo suffered from a medical condition. Again, however, even viewing this testimony in a light most favorable to Mr. Trujillo, this testimony established nothing more than a temporary illness rather than a medical condition protected by the Human Rights Act.

## 2. Failure to Accommodate.

{15} NORA also challenges the sufficiency of the evidence for the claim of failure to accommodate. Under the Human Rights Act, it is an unlawful discriminatory practice for an employer "to refuse or fail to accom-

modate to an individual's physical or mental handicap or medical condition, unless such accommodation is unreasonable or an undue hardship." Section 28–1–7(J). It appears that the accommodation claim was based on Mr. Trujillo's doctor having issued a certificate to return to work for "half time for one month."

{16} NORA argues that the certificate was inadequate to put it on notice that Mr. Trujillo was requesting an accommodation under the Human Rights Act. Mr. Trujillo responds that NORA should have known about his medical condition and thus regarded the medical release for half-time work as a request for accommodation. Mr. Trujillo accuses NORA of acting in bad faith for refusing to engage in an interactive process to determine whether the alleged condition could be reasonably accommodated. Mr. Trujillo relies upon *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1172 n. 10 (10th Cir. 1999), for this proposition. However, we do not read *Midland* to support such a claim, and we are unpersuaded by this argument. We note the Court in that opinion made the following observation:

> In general, the interactive process must ordinarily begin with the employee providing notice to the employer of the employee's disability and any resulting limitations, and expressing a desire for reassignment if no reasonable accommodation is possible in the employee's existing job.

*Midland* at 1171–72 (footnote omitted). In so concluding, the Court relied upon *Beck v. University of Wisconsin Board of Regents*, 75 F.3d 1130, 1134 (7th Cir.1996), which stated that "[a]n employee has the initial duty to inform the employer of a disability before ADA liability may be triggered for failure to provide accommodations." *Midland*, 180 F.3d at 1171 n. 9. Although the certificate did ask for a reduction in Mr. Trujillo's hours, it did not offer a diagnosis of his illness and how it limited his ability to work, or suggest any accommodation that his illness might require. Under the facts of this case, the terse language of the return to work certificate was insufficient to put NORA on notice that Mr. Trujillo was requesting an accommodation for a medical condition under the

Human Rights Act. We agree with the Fifth Circuit that an employer cannot be held to have imputed knowledge of an illness in the following circumstance:

> Where the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer, as is often the case when mental disabilities are involved, the initial burden rests primarily upon the employee, or his health-care provider, to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations.

*Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155, 165 (5th Cir.1996). Moreover, the failure to accommodate claim must fail because, as discussed above, Mr. Trujillo failed to demonstrate that he had a medical condition which is a necessary predicate for an accommodation request.

### 3. Discharge Because of Medical Condition.

{17} Even if we were to conclude that Mr. Trujillo had a medical condition on the day of his discharge, his claim under the Human Rights Act could not succeed because no evidence was presented at trial that NORA discriminated against him because of his health. The fact that NORA was aware of Mr. Trujillo's health problems is not sufficient to show that they regarded him as having a medical condition or that he was fired for that reason. *See Webb v. Mercy Hosp.*, 102 F.3d 958, 960 (8th Cir.1996) ("An employer's knowledge that an employee exhibits symptoms which may be associated with an impairment does not necessarily show that the employer regarded the employee as disabled.").

{18} The Human Rights Act states that it is unlawful for an employer to discriminate "because of" a medical condition. "[A]n employer cannot fire an employee 'because of' a disability unless it knows of the disability. If it does not know of the disability, the employer is firing the employee 'because of' some other reason." *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 932 (7th Cir.1995) (quoting 42 U.S.C. § 12112). No evidence was introduced at trial that Mr. Trujillo's

health was a factor in the decision to fire him. Mr. Trujillo did not testify that he thought he had been fired for health reasons. The letter placing him on administrative leave and the termination letter discussed a number of reasons NORA was dissatisfied with Mr. Trujillo's job performance; the shortcomings described by NORA predate his illness. There is no evidence that NORA regarded Mr. Trujillo as suffering from a medical condition. Neither at trial nor on appeal has Mr. Trujillo pointed to any evidence that NORA's decision to terminate him was based on anything but concerns about his work performance.

{19} Mr. Trujillo contends that because NORA failed to take the necessary actions to find out about his medical condition that they should be charged with that knowledge. Under the facts of this case, this contention is without merit because it would require this Court to impute knowledge to NORA at a time when even Mr. Trujillo's doctors had not diagnosed his illness. Instead, the diagnostic testing had apparently eased the initial concerns of the treating doctor to the extent that she had cleared Mr. Trujillo to return to work. As the Court stated in *Miller v. National Casualty Co.*, 61 F.3d 627, 630 (8th Cir.1995), an employer is "not obligated to divine the presence of a disability from [the employee's] extended absence from work and the company's knowledge that she [or he] was in some sort of stressful ... situation." Similarly, we do not think that knowledge of a medical condition may be imputed to an employer under the Human Rights Act.

## B. Retaliatory Discharge.

{20} Our holding on the claims under the Human Rights Act disposes of Mr. Trujillo's claim for retaliatory discharge. Because Mr. Trujillo's discharge did not violate the Human Rights Act, the claim of wrongful discharge in violation of public policy must fail. *See Gandy v. Wal–Mart Stores, Inc.*, 117 N.M. 441, 444–45, 872 P.2d 859, 862–63 (1994) (holding that an unlawful discharge under the Human Rights Act may provide the public policy basis for a claim of retaliatory discharge); *see also Sanders*, 91

F.3d at 1354 (applying the rationale that there can be "no public policy claim against employers who have not violated the law").

## C. Breach of Implied Contract.

{21} Mr. Trujillo successfully claimed below that he was terminated in violation of an implied contract with NORA. In making this argument, he relied upon an employee policy manual and NORA's dealings with other employees in disciplinary matters. He contended that the evaluation and discipline provisions described in the policy manual created an implied contract and that NORA was therefore contractually bound to follow the described procedures in terminating him. On appeal, NORA argues that the provisions in the policy manual relied on by Mr. Trujillo neither created a discharge procedure nor overcame the presumption of at-will employment.

{22} Employment without a definite term is presumed to be at will. *Garrity v. Overland Sheepskin Co.*, 1996–NMSC–032, ¶ 10, 121 N.M. 710, 917 P.2d 1382; *Hartbarger v. Frank Paxton Co.*, 115 N.M. 665, 672, 857 P.2d 776, 783 (1993). In an at-will employment relationship, both the employer and the employee have the right to terminate the employment relationship at any time and for any reason. *See Melnick v. State Farm Mut. Auto. Ins. Co.*, 106 N.M. 726, 730, 749 P.2d 1105, 1109 (1988). Our courts have recognized two exceptions to the at-will employment rule: (1) "wrongful termination under facts disclosing unlawful retaliatory discharge" or (2) "where the facts disclose the existence of an implied employment contract provision that limits the employer's authority to discharge." *Lopez v. Kline*, 1998–NMCA–016, ¶ 11, 124 N.M. 539, 953 P.2d 304. The parties may modify the at-will presumption by a contractual agreement regarding termination. *Newberry v. Allied Stores, Inc.*, 108 N.M. 424, 426–27, 773 P.2d 1231, 1233–34 (1989); *Kestenbaum v. Pennzoil Co.*, 108 N.M. 20, 24–26, 766 P.2d 280, 284–86 (1988). A representation in an employee handbook or personnel policies may contractually modify the at-will presumption. *Hartbarger*, 115 N.M. at 669, 857 P.2d at 780; *Newberry*, 108 N.M. at 426–27, 773 P.2d at 1233–34. To

create contractual rights, however, the terms of the representation must be sufficiently explicit to create a reasonable expectation of an implied contract. *Garrity*, 1996–NMSC–032, ¶ 12, 121 N.M. 710, 917 P.2d 1382.

{23} Mr. Trujillo relied on three provisions of the manual: two dealt with evaluation procedures and the third with discipline. After a review of these provisions, we conclude that they are insufficient to create an implied contract between NORA and Mr. Trujillo. *See Sanchez v. New Mexican*, 106 N.M. 76, 79, 738 P.2d 1321, 1324 (1987). The two sections dealing with performance evaluations detail when and how reviews are to be conducted. Mr. Trujillo's argument appears to be that these provisions link performance evaluation with termination. Because he was discharged without being afforded an evaluation, he argues that NORA breached an implied contract. But the difficulty we find with this argument is there is no language in the provisions requiring NORA to evaluate an employee as a prerequisite to termination.[2] Moreover, the section on discipline, contrary to the argument of Mr. Trujillo, states clearly that "The General Manager reserves the right to impose disciplinary sanctions, including discharge from employment ... for work performance that the General Manager deems unacceptable." This section further provides that determination of which disciplinary sanction to impose is left to the general manager's discretion. The manual unambiguously stated that NORA did not have to follow a progressive disciplinary practice before discharging an employee because the disciplinary sanctions "may or may not be progressive in terms of one sanction preceding or following another." Given this express language, the "written personnel policy cannot be said to have created any reasonable expectation of an implied contract." *Garrity*, 1996–NMSC–032, ¶ 12, 121 N.M. 710, 917 P.2d 1382.

{24} We are also not persuaded by Mr. Trujillo's argument that an implied contract was created by NORA's conduct in dealing with other employees. *See* UJI 13–

2303 NMRA 2001 ("In determining whether there was an implied agreement, you may consider all the surrounding circumstances, including ... how other employees in the same or similar circumstances were customarily dealt with by [employer]...."). Mr. Trujillo testified that he knew of other employees who had made mistakes and had been given warnings before termination. However, the manual states that, in matters of discipline, "[e]ach case is considered individually." From the testimony at trial, it appears that a case-by-case approach was used in making decisions about discipline and that other employees who were reprimanded or demoted were not in the "same or similar circumstances" as Mr. Trujillo.

**D. Intentional Infliction of Emotional Distress.**

{25} NORA also challenges Trujillo's claim of intentional infliction of emotional distress. In addressing this tort, our courts have adopted the approach used in the Restatement (Second) of Torts § 46 (1965). *See generally Padwa v. Hadley*, 1999–NMCA–067, ¶ 10, 127 N.M. 416, 981 P.2d 1234. The following elements must be proven to establish a claim of intentional infliction of emotional distress: "(1) the conduct in question was extreme and outrageous; (2) the conduct of the defendant was intentional or in reckless disregard of the plaintiff; (3) the plaintiff's mental distress was extreme and severe; and (4) there is a causal connection between the defendant's conduct and the claimant's mental distress." *Hakkila v. Hakkila*, 112 N.M. 172, 182, 812 P.2d 1320, 1330 (Ct.App.1991) (Opinion of Donnelly, J.). The Restatement describes extreme and outrageous conduct as that which is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) of Torts § 46 cmt. d; *see also Stieber v. Journal Publ'g Co.*, 120 N.M. 270, 274, 901 P.2d 201, 205 (Ct.App. 1995); UJI 13–1628 NMRA 2001 ("Extreme

2. Even if this had been the case, it is unclear how Mr. Trujillo could have had a reasonable expectation of an implied contract when the eval-

uation procedures had not been followed for two years.

and outrageous conduct is that which goes beyond bounds of common decency and is atrocious and intolerable to the ordinary person.").

{26} As a threshold matter, the trial court should determine as a matter of law whether the conduct at issue "reasonably may be regarded as so extreme and outrageous that it will permit recovery under the tort of intentional infliction of emotional distress." *Padwa*, 1999–NMCA–067, ¶ 9, 127 N.M. 416, 981 P.2d 1234. "When reasonable persons may differ on that question, it is for the jury to decide, subject to the oversight of the court." *Id.* (relying upon Restatement (Second) of Torts § 46 cmt. h). In a motion for directed verdict, NORA argued that there had been no evidence that they had acted recklessly or outrageously when they fired Trujillo.

{27} In *Stock v. Grantham*, 1998–NMCA–081, ¶ 35, 125 N.M. 564, 964 P.2d 125, the Court of Appeals "recognize[d] that only in extreme circumstances can the act of firing an employee support a claim of intentional infliction of emotional distress." We agree. Being fired is a common occurrence that rarely rises to the level of being "beyond all possible bounds of decency" and "utterly intolerable in a civilized community." Our review of the record persuades us that the facts of this case do not satisfy any of the elements of the tort; the failure of any one of the elements will defeat the claim. Mr. Trujillo has not pointed to evidence of specific instances in which NORA's conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency. NORA's conduct in this case was to fire an employee whose performance they no longer considered satisfactory. When Mr. Trujillo received the termination letter from NORA, he had been cleared by his doctor to return to work on a part-time basis because medical testing had revealed no physical problems. We conclude that NORA's actions were not extreme and outrageous and thus did not satisfy the threshold requirement for intentional infliction of emotional distress.

{28} The claim must also fail because there was insufficient evidence to support the view that the emotional distress experienced by Mr. Trujillo was severe. *See Hakkila*, 112 N.M. at 182, 812 P.2d at 1330 (Opinion of Donnelly, J.); *U.S.A. Oil, Inc. v. Smith*, 415 So.2d 1098, 1101 (Ala.Civ.App. 1982) ("[I]n order to prevent the tort of outrage from becoming a panacea for all of life's ills, recovery must be limited to distress that is severe."). "To recover emotional distress damages, those damages must be 'severe.' " *Jaynes v. Strong–Thorne Mortuary, Inc.*, 1998–NMSC–004, ¶ 20, 124 N.M. 613, 954 P.2d 45 (quoting *Flores v. Baca*, 117 N.M. 306, 313, 871 P.2d 962, 969 (1994)). Severe emotional distress means that " 'a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances.' " *Id.* (quoting *Folz v. State*, 110 N.M. 457, 469, 797 P.2d 246, 254 (1990)). In other words, the distress must be "so severe that no reasonable [person] could be expected to endure it." Restatement (Second) of Torts § 46 cmt. j. Mr. Trujillo testified that his initial reaction was to feel offended by being called "Sir" in the termination letter and that he resented being fired after giving NORA so many years. He also testified that he felt "lousy" and depressed and that Prozac was prescribed for him. His wife described him as being depressed and sleeping long hours and as having erratic eating habits during the period after he was fired. Without minimizing Mr. Trujillo's distress, we conclude that this evidence was legally insufficient under New Mexico law. "The law intervenes only where the distress inflicted is so severe that no reasonable [person] could be expected to endure it." *Phifer v. Herbert*, 115 N.M. 135, 139–40, 848 P.2d 5, 9–10 (Ct.App.1993) (quoting Restatement (Second) of Torts § 46 cmt. j), *overruled on other grounds by Spectron Dev. Lab. v. Am. Hollow Boring Co.*, 1997–NMCA–025, ¶¶ 31–32, 123 N.M. 170, 936 P.2d 852.

### E. Loss of Consortium.

{29} Our holding on Mr. Trujillo's claim of wrongful termination also reverses the loss of consortium claim by Mrs. Trujillo which was premised on her husband's termination. *See Archer v. Roadrunner Trucking, Inc.*, 1997–NMSC–003, ¶ 11, 122 N.M. 703,

930 P.2d 1155 ("Loss-of-consortium damages are contingent upon the injured person's entitlement to general damages.").

### F. Damages.

{30} We offer the following to explain why in this case it was necessary to discuss both retaliatory discharge and breach of implied contract. This Court held in *Silva v. Albuquerque Assembly & Distribution Freeport Warehouse Corp.*, 106 N.M. 19, 21, 738 P.2d 513, 515 (1987) and reaffirmed in *Gandy*, 117 N.M. at 444–45, 872 P.2d at 862–63, that a plaintiff may not recover twice for the same harm; that is, compensatory damages may not be awarded in an employment case on both a claim of breach of an employment contract and a claim of the tort of retaliatory discharge. As we concluded in *Silva*, trial courts should instruct the jury that "they could find either a breach of contract or retaliatory discharge, but not both." *Silva*, 106 N.M. at 21, 738 P.2d at 515. This distinction was not made in instructions given in this case. On the special verdict form, the jury was permitted improperly to find for Mr. Trujillo on both the claims of retaliatory discharge and breach of an implied contract. The jury was also not instructed that the Human Rights Act does not permit the award of punitive damages. *See Gandy*, 117 N.M. at 443, 872 P.2d at 861 ("Punitive damages are sometimes recoverable in tort actions but are not recoverable under the Human Rights Act.") (relying upon *Behrmann v. Phototron Corp.*, 110 N.M. 323, 328, 795 P.2d 1015, 1020 (1990)).

### III. CONCLUSION

{31} We reverse the claim under the Human Rights Act for discharge because of a medical condition as well as the claims for retaliatory discharge, breach of implied contract, intentional infliction of emotional distress, and loss of consortium. The award of compensatory and punitive damages and the order on attorney's fees, costs, and prejudgment interest are also reversed. We note that the award of attorney's fees and costs was inconsistent with our holding in *Gonzales*, 2000–NMSC–029, ¶¶ 35–36, 129 N.M. 586, 11 P.3d 550, that a complainant could receive attorney's fees only for claims under the Human Rights Act. *See also Gandy*, 117 N.M. at 443, 872 P.2d 859 at 861 ("[A]ttorney's fees are recoverable under the [Human Rights] Act, but generally are not recoverable in a tort action.") (citations omitted); *cf. Gaglidari v. Denny's Rests, Inc.*, 117 Wash.2d 426, 815 P.2d 1362, 1375 (1991) (en banc) ("Segregation is required where attorney fees are authorized for only some of the claims.").

{32} **IT IS SO ORDERED.**

WE CONCUR: PATRICIO M. SERNA, Chief Justice, JOSEPH F. BACA, Justice, PAMELA B. MINZNER, Justice, and PETRA JIMENEZ MAES, Justice.