# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: <u>September 10, 2015</u>

**NO. 32,331**

**CENTEX/WORTHGROUP, LLC,**

Plaintiff-Appellant,

v.

**WORTHGROUP ARCHITECTS, L.P. and
TERRACON, INC.,**

Defendants-Appellees.

**APPEAL FROM THE DISTRICT COURT OF OTERO COUNTY
Jerry H. Ritter, District Judge**

Lorenz Law
Alice T. Lorenz
Albuquerque, NM

Akin Gump Strauss Hauer & Feld LLP
Pratik A. Shah
Hyland Hunt
Washington, D.C.

for Appellant

Montgomery & Andrews, P.A.
Kevin M. Sexton
Andrew S. Montgomery
Santa Fe, NM

for Appellee Worthgroup Architects, L.P.

**OPINION**

**KENNEDY, Judge.**

**I.    INTRODUCTION**

{1}    This appeal involves a dispute between a general contractor, Centex/Worthgroup, LLC (Centex), and a subcontractor, Worthgroup Architects, L.P. (Architect). Centex and Architect entered into a contractual relationship which, among other things, governed the construction of a Mechanically Stabilized Earth (MSE) Wall. The MSE Wall ultimately failed, and Centex brought this suit against Architect and Terracon, Inc., claiming over $6,000,000 in damages for redesign and repair costs that it incurred. Centex asserted that Architect is required to cover the costs Centex incurred in redesigning and repairing the MSE Wall. Architect conversely asserted that its monetary obligations to Centex have been satisfied by the payment of proceeds of insurance coverage that it was contractually obligated to procure and maintain.

{2}    Centex appeals a grant of summary judgment to Architect, in which the district court apparently determined that a limitation of liability clause in a prime contract flowed down to the subcontract by virtue of a flow-down clause. We reverse. We note that Centex contends genuine issues of material fact remain, but, for the reasons that follow, we decline to consider whether this is the case and remand so that the district court can consider the facts and arguments in light of the holding in this Opinion.

## II. BACKGROUND

{3} In February 2002, the Inn of the Mountain Gods Resort and Casino (Owner) contracted with Centex for an expansion and renovation project. These parties defined the terms of their business relationship in a second amended design/build construction contract (the prime contract). Centex then entered into a subcontract with Architect, where Architect agreed to perform design work on the project. Both the prime contract and the subcontract are relevant to our analysis in this case.[1]

{4} We begin with a brief overview of the prime contract and subcontract, continue with an account of the proceedings in district court, and end with a discussion of the law relevant to our holding.

### A. The Prime Contract

{5} The prime contract governs the contractual relationship between Owner and Centex with regard to the project. The first section of the prime contract that the parties have termed the "limitation of liability" clause[2] is relevant to this appeal. The limitation of liability clause provides:

> In addition to all other insurance requirements set forth in this Agreement, Design/Builder shall require its design professional Subcontractor(s) to obtain and maintain professional errors and

---

[1] Architect also entered into an agreement with Terracon, Inc. for services to construct the MSE Wall. Terracon has since been dismissed from this case.

[2] For the sake of clarity, we will continue using this characterization.

omissions coverage with respect to design services in accordance herewith. . . . [S]uch coverage shall be for each such design professional Subcontractor in an amount not less than $3,000,000. Owner agrees that it will limit Design/Builder liability to [O]wner for any errors or omissions in the design of the Project to whatever sums Owner is able to collect from the above described professional errors and omissions insurance carrier.

**B.    The Subcontract**

{6}    The subcontract, which governs the contractual relationship between Centex and Architect with regard to the project, contains an incorporation by reference clause, which requires Architect to perform the design work in strict accordance with the prime contract and incorporates the prime contract by reference. The subcontract reflects Centex's and Architect's intent that "all the terms of all documents are to be considered as complementary." Should such an interpretation be impossible, however, the parties provide the desired sequence for use of the documents, hereinafter referred to as the order of precedence clause.

> [T]he order of precedence of the documents, . . . shall be: (1) the most current approved edition of the [c]onstruction [d]ocuments; (2) modifications to [the subcontract]; (3) [the subcontract], unless the [prime contract] imposes a higher standard or greater requirement on the parties, in which case the [prime contract]; (4) the [prime contract], unless the provisions of (3) apply.

{7} The subcontract also includes a provision—referred to by the parties as a flow-down clause[3]—which states:

> In respect of the [d]esign [w]ork, [Architect] shall, except as otherwise provided herein, have all rights toward [Centex] which [Centex] has under the [prime contract] towards the Owner and [Architect] shall, to the extent permitted by applicable laws and except as provided herein, assume all obligations, risks[,] and responsibilities toward [Centex] which [Centex] has assumed towards the Owner in the [prime contract] with respect to [the d]esign [w]ork.

The central dispute between the parties revolves around the meaning and reach of this provision.

{8} The subcontract also provides a general liability clause, which makes Architect responsible for "[r]edesign costs and additional construction costs of [Centex] and/or the [c]ontractor required to correct [Architect's] errors or omissions," but specifies that Architect's "responsibility shall not preclude the pursuit of available insurance proceeds on account thereof[.]"

{9} Finally, the subcontract assigns rights and obligations to the parties regarding insurance and liability. For instance, Architect is required to procure "insurance coverage from insurers acceptable to [Centex]" and "shall be responsible for all

---

[3]A concept closely related to incorporation by reference, "flow-down" clauses are commonly used in construction contracts to allow a subcontractor to "assume toward the general contractor all of the obligations and responsibilities the contractor assumes toward the owner in the [prime] contract." T. Bart Gary, *Incorporation by Reference and Flow-Down Clauses*, 10 Const. Law 1, 46 (1990).

4

deductibles relating to claims under all applicable insurance policies on account of the [d]esign [w]ork, including the [p]rofessional [l]iability [i]nsurance provided by Design Builder." Architect is further required to name Centex, the [c]ontractor, and Owner as "additional insureds" on the insurance coverage and maintain the coverage "until expiration of [Architect's] obligations" under the subcontract. Another section of the subcontract requires Architect to "provide a [p]roject [p]olicy for [p]rofessional [l]iability insurance with [l]imits of [l]iability of $3,000,000 per occurrence and $3,000,000 Aggregate."

## C.    Construction And Failure of the MSE Wall

{10}    Construction of the MSE Wall began in June 2003. The MSE Wall began to fail in April 2004, causing damage to various "adjacent structures and ground-supported elements." Owner demanded that Centex remedy the defects and damage. Despite having demanded that Architect redesign the MSE Wall and repair any damage that resulted from the wall's failure, Centex spent over $6,000,000 for others to redesign and repair the MSE Wall in September 2004. Centex, as a named insured, requested payment of the available policy limits from Lexington Insurance Company (Lexington) and received payment in the amount of $3,000,000, representing the full policy limit for the claim submitted.

## D. District Court Proceedings

{11} Centex commenced this suit against Architect in May 2007 seeking $6,766,155.56, plus costs and expenses, on the grounds that Architect refused to adequately reimburse Centex for the damages incurred in implementing the redesign and repairs required by Owner. Centex's complaint alleges negligence, negligent misrepresentation, breach of contract, and entitlement to attorney fees. Architect, in its response to Centex's complaint, counterclaimed against Centex with three claims: declaratory judgment based on the limitation of liability clause in the prime contract and satisfaction of liability via Lexington's payment of the insurance proceeds; breach of contract based on Centex's failure to enforce the limitation of liability clause against Owner; and indemnification also based on Centex's failure to enforce the limitation of liability clause in favor of Architect. Architect later filed a motion for summary judgment, asserting that the prime contract's limitation of liability clause, which was incorporated into the subcontract through the flow-down clause, limited Centex's ability to recover damages arising from design errors or omissions. Architect also asserted in its motion that the Lexington payment satisfied and therefore extinguished Architect's liability to Centex for design errors and omissions. Architect further asserted that summary judgment was appropriate because of

6

Centex's failure to enforce the limitation of liability clause for the benefit of Architect, as required by the subcontract.

{12} The district court held a hearing on the motion for summary judgment, during which the parties argued extensively over what insurable risk the Lexington payment was intended to satisfy. Centex argued that the policy was paid for construction defects while Architect argued that the Lexington policy was paid for design errors and omissions. No release was executed as a result of the Lexington payment. When the district court questioned Centex as to why, if the policy was for construction defects, Centex did not recover from the remaining policy covering design errors and omissions, Centex conceded that if the Lexington policy were indeed for construction defects, it could conceivably make another claim against a design errors and omissions policy. Centex insisted, however, that while the prime contract was set up to shield Owner from excess costs, the subcontract was not constructed to similarly shield Architect from shouldering redesign costs. After hearing arguments from the parties, the district court ordered supplemental briefing so that the parties could address what exactly the insurance payout covered. Architect included a letter from Lexington to Centex as an exhibit in its supplemental briefing, in which Lexington reminded Centex that its policy specifically excluded "any claim based upon or

arising out of the cost to repair or replace any faulty . . . construction . . . performed in whole or in part by . . . the insured[.]"

{13} Upon completion of briefing, the district court issued an order granting Architect's motion for summary judgment. The order simply stated that, "having considered all of the pleadings and arguments of counsel, it is the finding and conclusion of the [c]ourt that there are no disputed issues of material fact and that [Architect is] entitled to judgment as a matter of law in accordance with [its] motion[]." Looking to the contract and these facts, we cannot determine on what basis the district court granted judgment as a matter of law. However, given the terms of the contracts, we hold that summary judgment was not appropriate, as a matter of law, for the reasons that follow.

## III. DISCUSSION

{14} Neither counsel cites, nor have we been able to find, any New Mexico authority precisely on point. The issue, which is one of first impression in New Mexico, is whether the flow-down clause allows the limitation of liability clause in the prime contract to limit Architect's liability to whatever sums Centex could collect from the errors and omissions insurance policy, or whether Architect's liability is controlled by the general liability clause in the subcontract. We hold that the general liability clause in the subcontract controls Architect's liability in the context of this case.

## A. Standard of Review

{15} Rule 1-056(C) NMRA allows a party to move for summary judgment when there is "no genuine issue as to any material fact" and the moving party is entitled to "a judgment as a matter of law." *E.g.*, *Self v. United Parcel Serv., Inc.*, 1998-NMSC-046, ¶ 6, 126 N.M. 396, 970 P.2d 582. Where the facts are not in dispute and only the legal significance of the facts is at issue, summary judgment is appropriate. *Gardner-Zemke Co. v. State*, 1990-NMSC-034, ¶ 11, 109 N.M. 729, 790 P.2d 1010. "[W]hen the [district] court's grant of summary judgment is grounded upon an error of law, [however,] the case may be remanded so that the issues may be determined under the correct principles of law." *Rummel v. Lexington Ins. Co.*, 1997-NMSC-041, ¶ 16, 123 N.M. 752, 945 P.2d 970.

## B. The Language of the Subcontract Controls

{16} Although the parties disagree as to how the prime contract and the subcontract apply in this instance, the district court made no finding as to ambiguity, and the parties agree that the contracts are not ambiguous. *See Kirkpatrick v. Introspect Healthcare Corp.*, 1992-NMSC-070, ¶ 14, 114 N.M. 706, 845 P.2d 800 (stating rule that "ambiguity is not established simply because the parties differ on the contract's proper construction"). We consider the contracts to be sufficient to reach our result.

{17} Rather than indicate on what undisputed facts it relied when granting summary judgment, or orally recite its reasons for doing so, the district court mirrored the language of Rule 1-056(C), stating that there were "no disputed issues of material fact." *Id.*[4] (requiring a showing of "no genuine issue as to any material fact"). It appears, based on its order, that the district court applied the flow-down clause, incorporated the limitation of liability clause into the subcontract, and determined that Architect's obligation to procure insurance was satisfied by the Lexington policy. If this is the case, the Lexington payment would have released Architect from liability for Centex's claims.

**1. The Flow-Down Clause Contains "Words of Definite Limitation" That Must Be Given Effect**

{18} Our courts strive to give effect to a contract according to its terms. *Aktiengesellschaft Der Harlander Buamwollspinnerie Und Zwirn-Fabrik v. Lawrence*

---

[4]We are aware the district court is not required to state its reasons for granting summary judgment. *Garrett v. Nissen Corp.*, 1972-NMSC-046, ¶¶ 11-12, 84 N.M. 16, 498 P.2d 1359, *overruled on other grounds by Klopp v. Wackenhut Corp.*, 1992-NMSC-008, 113 N.M. 153, 824 P.2d 293. In complicated or novel cases such as this one, however, it assists the parties in their briefing to "know upon what grounds the judgment was granted in order to properly present the controversial issue to the appellate court." *Wilson v. Albuquerque Bd. of Realtors*, 1970-NMSC-096, ¶ 12, 81 N.M. 657, 472 P.2d 371, *overruled in part by Akre v. Washburn*, 1979-NMSC-017, 92 N.M. 487, 590 P.2d 635. It is equally beneficial to appellate courts attempting to conduct competent appellate review. *See Phillips v. United Serv. Auto. Ass'n*, 1977-NMCA-137, ¶¶ 34-36, 91 N.M. 325, 573 P.2d 680 (Sutin, J., specially concurring).

*Walker Cotton Co.*, 1955-NMSC-090, ¶ 33, 60 N.M. 154, 288 P.2d 691. "Parties to a contract agree to be bound by its provisions . . . . When a contract was freely entered into by parties negotiating at arm's length, the duty of the courts is ordinarily to enforce the terms of the contract which the parties made for themselves." *Nearburg v. Yates Petroleum Corp.*, 1997-NMCA-069, ¶ 31, 123 N.M. 526, 943 P.2d 560 (citation omitted); 17A C.J.S. *Contracts* § 432 (2015) ("[W]here it is not ambiguous, a construction contract is to be construed according to its terms." (footnote omitted)). As such, where a subcontract contains "words of definite limitation," those words are given effect and the incorporation of the prime contract is limited accordingly. *Perry v. United States ex rel. Newell*, 146 F.2d 398, 400 (5th Cir. 1945) (reasoning that because the subcontract contained "words of definite limitation," the work description incorporated from the prime contract "was effective only to the extent that it did not conflict with what was specifically agreed upon" in the subcontract). "Although a subcontract may incorporate by reference the terms of the prime contract, the incorporation may be limited to a special purpose." *Mountain States Constr. Co. v. Tyee Elec., Inc.*, 718 P.2d 823, 825 (Wash. Ct. App. 1986).

{19} Centex and Architect dispute the importance of Section 1.4.2(b) in the subcontract. Section 1.4.2(b) provides that Architect is responsible for "[r]edesign costs and additional construction costs of [Centex] required to correct [Architect's]

errors or omissions." In its discussion of the flow-down clause's applicability, Centex argues that the "except as otherwise provided herein" language contained in the flow-down clause limits the flow-down clause's applicability because Section 1.4.2(b) specifically allocates the liability between Centex and Architect. Thus, Centex argues, the flow-down clause does not bring in the limitation of liability clause of the prime contract because liability was otherwise provided for in the subcontract. We agree with Centex.

{20} The express language of the flow-down clause limits the incorporation of the prime contract into the subcontract. By its terms, only rights, obligations, risks, or responsibilities that the prime contract set forth—and the subcontract has not allocated otherwise—can flow down to the subcontract: "[Architect] shall, *except as otherwise provided herein*, have all rights . . . obligations, risks and responsibilities toward [Centex.]" "Except as otherwise provided" are "words of definite limitation." *Cf. Holdeman v. Epperson*, 111 Ohio St. 3d 551, 2006-Ohio-6209, 857 N.E.2d 583, at ¶ 19 (naming "except as otherwise provided in the operating agreement" as a "limiting word[]" (internal quotation marks and citation omitted)). Section 1.4.2(b) allocates Architect's liability to Centex, clarifying that Architect is liable for redesign and additional construction costs required to correct Architect's errors or omissions. The rights created in the limitation of liability clause, if allowed to flow down to the

subcontract, "limit [Architect's] liability to [Centex] for any errors or omissions in the design of the [p]roject" to sums collected from errors and omissions insurance. Both provisions purport to allocate Architect's liability to Centex, but do so in ways that are so different that they cannot coexist. In order to give the "except as otherwise provided herein" language full effect, we therefore limit the flow-down clause's broad incorporation of the prime contract; by its express terms, the subcontract's allocation of liability governs.

**2. To The Extent That Section 1.4.2(b) and the Limitation Of Liability Clause Allocate Architect's Liability Differently, Section 1.4.2(b) Controls**

{21} Even without the flow-down clause's words of definite limitation, the subcontract's allocation of liability still prevails over the flow-down clause's incorporation of the prime contract. Numerous jurisdictions have implemented the rule that "if the specific provisions of the subcontract conflict with the plans and specifications, or with the general contract between the prime contractor and the owner (all of which are incorporated into the subcontract), the terms of the subcontract prevail." *McKinney Drilling Co. v. Collins Co.*, 517 F. Supp. 320, 327-28 (N.D. Ala. 1981). "[W]here the [s]ubcontract has clearly stated the parties' intentions at the time of contracting, the flow-through clause cannot be read to render those clear intentions a nullity." *Larry Snyder & Co. v. Miller*, No. 07-CV-455-PJC, 2010 WL 830616, at *6 (N.D. Okla. Mar. 2, 2010). "The general language of a standard

incorporation clause cannot trump the specific language of the subcontract[.]" *Bernotas v. Super Fresh Food Mkts., Inc.*, 863 A.2d 478, 484 (Pa. 2004).

{22}     The allocation of liability in the prime contract cannot coexist with Section 1.4.2(b). Architect's liability under one is not equivalent to its liability under the other. While the prime contract limits Centex's recovery from Architect to "whatever sums" it can collect from the errors and omissions insurance carrier, the subcontract allows, without limit, recovery for redesign costs and additional construction costs, and does not preclude "pursuit of available insurance proceeds." Pursuant to the legal principles outlined above, the express allocation of liability in the subcontract prevails over the limitation of liability clause in the prime contract; Section 1.4.2.(b) governs Architect's liability to Centex. Architect must therefore shoulder full responsibility for the consequences of its errors and omissions, if any.

**3.     Our Interpretation Is In Accordance With the Order of Precedence Clause**

{23}     The parties are divided on whether our interpretation of the contracts is in accord with the order of precedence clause. We conclude that it is. *See APAC–Tenn., Inc. v. J.M. Humphries Constr. Co.*, 732 S.W.2d 601, 604 (Tenn. Ct. App. 1986) (holding that the clear language of the order of precedence clause required that the subcontract govern in the event that the prime contract's provisions were inconsistent with the subcontract). In the order of precedence clause, the parties required that all

14

terms and all documents be considered as complementary and laid out an order of precedence "in the event that such an interpretation is not possible[.]" The parties agreed that, in the event that the terms of the contracts somehow conflict, the subcontract governs unless the prime contract "imposes a higher standard or greater requirement on the parties," in which case the prime contract governs. Each party argues that its own interpretation of the flow-down clause's applicability is in accord with the application of the "higher standard." For example, Centex argues that the prime contract does not impose any higher standard, so the subcontract should govern. Conversely, Architect argues that the prime contract actually imposes a higher standard than the subcontract, so the prime contract should govern.

{24} To the extent that the flow-down clause causes any conflict between the two agreements' allocation of liability, we agree with Centex; the subcontract imposes a higher standard. Section 1.4.2(b) represents a more severe undertaking for Architect than the limitation of liability clause in terms of monetary responsibility for its own errors and omissions. The limitation of liability clause imposes the requirement that Architect obtain and maintain a $3,000,000 insurance policy, which then covers its liability, while Section 1.4.2(b) allows Architect to potentially be liable for any construction or redesign costs incurred as a result of its errors and omissions. Architect is therefore liable for a much higher amount of money for its errors and

omissions under Section 1.4.2(b) than under the limitation of liability clause. As such, the subcontract takes precedence, and our determination that the terms of the subcontract govern over conflicting terms incorporated from the prime contract is therefore in accordance with the order of precedence clause.

{25}     Although the flow-down clause does not incorporate the limitation of liability clause into the subcontract under our holding here, the flow-down clause is not rendered superfluous. It still applies to incorporate other clauses from the prime contract into the subcontract, so long as such an incorporation does not run afoul of its own words of definite limitation. It is only when the subcontract provides rights, obligations, risks, and responsibilities that differ from those set forth in the prime contract that the subcontract governs regardless of the flow-down clause application.

## IV.    CONCLUSION

{27}     We conclude that the district court based its grant of summary judgment on a mistaken interpretation of the law. Applying rules governing the applicability of the flow-down clause that are widely accepted among other jurisdictions, we determine that the subcontract's terms regarding liability govern for any one of three reasons: (1) the flow-down clause's words of definite limitation must be given effect; (2) the well-recognized rule that when specific provisions in the subcontract conflict with provisions in the prime contract, the subcontract controls; and (3) the order or

precedence clause explicitly requires that the subcontract govern when clauses cannot be read as complementary. We hold that the flow-down clause does not incorporate the limitation of liability clause from the prime contract in the subcontract, and Section 1.4.2(b) governs Architect's liability to Centex. We reverse.

{28}    **IT IS SO ORDERED.**


_____
                                    **RODERICK T. KENNEDY, Judge**

**WE CONCUR:**


_____
**MICHAEL D. BUSTAMANTE, Judge**


_____
**JONATHAN B. SUTIN, Judge**